UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

CINNAMON WENTZ,

                    Plaintiff,           Civil Action No.: 14-11870
                                         Honorable Mark A. Goldsmith
          v.                     Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 11]

Plaintiff Cinnamon Wentz ("Wentz") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Wentz is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Wentz's motion [9] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.      **Procedural History**

On August 22, 2011, Wentz filed an application for DIB and SSI, alleging disability as of August 18, 2011.  [Tr. 121-36].  The claim was denied initially on October 13, 2011.  [Tr. 55-74, 78-81, 84-87].  Thereafter, Wentz filed a timely request for an administrative hearing, which was held on November 13, 2012, before ALJ Roy L. Roulhac.  [Tr. 28-51].  Wentz, who was represented by attorney Marc Sussman, testified, as did vocational expert ("VE") Diane Regan.  On December 19, 2012, the ALJ found Wentz not disabled.  [Tr. 11-27].  On April 8, 2014, the Appeals Council denied review.  [Tr. 1-6].  Wentz filed for judicial review of the final decision on May 9, 2014.  [1].

B.      **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    Plaintiff's Testimony and Subjective Reports

Wentz completed a function report on September 10, 2011.  [Tr. 178-89].  She reported that she was unable to work due to purported "economic occupational and other psychological and environmental problems."  [Tr. 182].  She also reported that she was "very forgetful."  [*Id.*].

Wentz reported that her daily activities primarily revolved around watching TV, visiting friends, and attending group therapy sessions at the Thumb Alliance Prepaid Inpatient Health Plan Center ("Thumb Alliance"), and stated that she goes outside five days per week.  [Tr. 183, 185, 189].  Wentz also reported acting as a personal care aide to her boyfriend, Patrick Early, in addition to performing housework, shopping, and laundry on his behalf.  [Tr. 183].

Wentz reported being able to cook meals of all varieties, and cooked on a daily basis.

3

[Tr. 184].  She also reported no limitation in her ability to complete household chores, said she cleaned her apartment three times weekly and did laundry monthly, and said she did not require reminders or encouragement to perform these tasks.  [Tr. 184].  She reported being able to drive, but generally walked to her destinations.  [Tr. 185].  Wentz stated that she shopped for food in stores approximately twice monthly for an hour or more per trip.  [*Id.*].

Wentz further reported that her conditions did not affect her personal care or grooming in any way, and she did not require reminders to take medicine or take care of personal needs.  [Tr. 183].  She said that she could handle money and pay bills without restriction.  [Tr. 185].

Wentz reported that she read books, played sports, watched television, rode her bike, and sewed.  [Tr. 186].  She said that she played sports once weekly, and engaged in her other hobbies "all week long."  [*Id.*].  She also reported spending her time talking with others "in person, on the phone, and on the computer . . . all week long," and stated that she was able to do so without accompaniment.  [*Id.*].  Similarly, she reported no problems getting along with friends, family, neighbors, or others.  [Tr. 187].  However, Wentz also reported her social activities are sometimes curtailed because "there is [sic] days [when] I do not want to do anything."  [*Id.*].

Wentz reported that her conditions limited her memory, concentration, and understanding: she stated that she did "not remember . . . what people tell me [and] I can not concentration [sic] on stuff or what I want to say."  [Tr. 187].  She reported difficulty paying attention, finishing projects, and following spoken instructions, but also said that she followed written instructions "very good."  [*Id.*].  She reported handling both stress and change in routine poorly, and suffered from mood swings.  [Tr. 188].

In an undated disability report, Wentz reported that the conditions which limited her ability to work were bipolar disorder, depression, panic attacks, anxiety, and a learning disability.

4

[Tr. 203]. She also reported that she previously worked sporadically from 1987 to 2009 as a cashier and food preparation worker, from 2001 to 2006 as a cleaning person, and, as of the date of her report, was working as a caretaker. [Tr. 204]. She further reported taking the anti-depressants Lamictal and Celexa, and anti-anxiety medication Klonopin. [Tr. 205].

Wentz's boyfriend, Patrick Early, completed a third-party function report on September 21, 2011. [Tr. 192-201]. He reported that he knew Wentz for four years, and spent eight to twelve hours with her daily. [Tr. 194]. He asserted that Wentz's condition "slow's [sic] her down," and causes her to "get depressed [and] stay inside for 2 or three days." [*Id*.]. Early indicated that Wentz spent much of her time at the Thumb Alliance mental health center, and spent the balance of her time reading or cooking. [Tr. 195].

Early reported that Wentz's condition restricted her memory, and that she woke up frequently because of her illnesses. [Tr. 195]. Early contradicted Wentz's own report in some respects, including that Wentz: required reminders to cook and perform chores; was unable to handle money or pay bills; had difficulty getting along with others,[1] and did not follow written instructions well. [Tr. 196-199].

At her November 13, 2012 hearing before the ALJ, Wentz testified that she spends her time watching television, using her computer, reading, and attending activities at the Thumb Alliance mental health center. [Tr. 34-35]. Wentz testified that she was sleeping well. [Tr. 34]. She testified that she was in the process of completing paperwork to enroll in a college. [Tr. 35]. She also testified that she spends between two and four hours daily assisting Early with his needs in her role as caregiver. [*Id.*]. Wentz confirmed that she regularly visits friends, does housework, cooks, and goes shopping. [Tr. 36-37].

---

[1] Early attributed this to Wentz' mood swings, which she also reported. [Tr. 188].

Wentz testified that she is unable to work because she cannot concentrate, and because she suffers from bipolar disorder and depression. [Tr. 36]. She asserted that she has difficulty trying to "figure out what [she] want[s] to do," that she was "trying to get out and about more, but with the depression [she would] rather be at home and in bed." [Tr. 38]. She also testified that her depression sometimes causes her to spend up to "24 hours [in bed] besides getting up to use the restroom," and that she experiences such depression for approximately one full week every other week. [Tr. 38-39].

Wentz told the ALJ that she visits with friends "about once a week on a good week." [Tr. 40]. She also said that she assists at bingo sessions at the Thumb Alliance mental health center once a week for one hour, and that between 10 and 20 people attend that event. [Tr. 35, 40]. She reported that even her bingo sessions can become "overwhelming" on occasion because she "go[es] into anxiety attack or [she] can't be around no one," and that she will "go into a back room just to be alone." [Tr. 41].

With regard to concentration, Wentz asserted that she cannot focus on a task for more than five minutes at a time. [Tr. 42]. However, she also testified that she enjoys crocheting and generally focuses for 10 minutes at a time on that task. [*Id*.]. She further stated that she would be unable to complete even sedentary work because she would get up "to walk around and then try[] to do something else instead of going back to the one thing I was doing, plus the depression and getting overwhelmed." [Tr. 44]. Wentz also testified that she has difficulty performing household tasks because she becomes confused and loses focus. [Tr. 45].

## 2.   *Medical Evidence*

While Wentz's medical records reflect some level of physical impairment, she does not challenge the ALJ's finding that she suffered from only mental impairments. [Tr. 16]. Thus, the

Court will focus solely on medical evidence relevant to her mental impairments.

### a.   Treating Sources

### 1.   Dr. Binkley's Records

The majority of Wentz's treating-source medical records are from Thumb Alliance.  [Tr. 249-484].  These records are comprised primarily of progress notes written by nurses and social workers and treatment notes from psychiatric doctor Barry Binkley.  Wentz first treated with Dr. Binkley on October 14, 2010.  [Tr. 248, 300].  Dr. Binkley found that Wentz suffered from bipolar disorder type II, panic disorder without agoraphobia, generalized anxiety disorder, attention deficit hyperactivity disorder, math learning disorder, hypothyroidism, and restless leg syndrome, and assessed a Global Assessment Functioning ("GAF") score of 50, which is indicative of moderate symptoms.[2]  [*Id*.].  He recorded that her chief complaint was "severe depression with recent feeling that she wanted to take her life by cutting herself."  [Tr. 301].  She complained that she "never fe[lt] completely out of her depression," and noted that  "[i]t fluctuates over time." [*Id*.].  Wentz reported that she "fe[lt] very irritable and also isolate[d] herself in her room."  [*Id*.].  She further complained of impaired concentration when depressed and irritable.  [*Id*.].  She further complained of mild paranoia while depressed, but did not suffer from delusions, though she reported that she experienced daily panic attacks.  [*Id*.].  Dr. Binkley concluded that Wentz's objective mental state was generally normal except that her "affect was mildly blunted at times," her "mood was considered to be mildly depressed, but [with] basically no acute distress," and her abstract thinking was somewhat impaired.  [Tr. 303].  He started Wentz on a regimen of Lexapro and Lamictal to treat mood swings and anxiety.  [*Id*.].

---

[2] A GAF from 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, 4th ed., p. 32.

4:14-cv-11870-MAG-DRG   Doc # 13   Filed 07/10/15   Pg 8 of 21   Pg ID 563

On November 8, 2010, Dr. Binkley found that Wentz was "beginning to feel better, able to control her emotions better in situations or conflicts with other people," and that she was "responding in a positive direction so far to her treatment for bipolar disorder." [Tr. 299]. He also found that her depression was less severe, but that she "still has a way to go . . . in terms of sleep and depression." [*Id*.].

On December 27, 2010, Wentz reported to Dr. Binkley that "her depression [was] gradually improving," and was reduced in severity from a ten out of ten rating to merely three or four out of ten. [Tr. 298]. Wentz said she was "very happy with the med[ication]s." [*Id*.]. Dr. Binkley found that she had "a good attitude about things," and that her concentration "appears to be good now." [*Id*.]. He concluded that she was "responding quite well to her current treatment" and that her "[p]rognosis appears to be good at this time." [*Id*.].

On February 28, 2011, Dr. Binkley found that Wentz "appear[ed] to be responding to her bipolar medications," that she was "sleeping and eating pretty normally." [Tr. 297]. He found that she had "some mild cognitive impairment because of her condition," and that her "mood seems like just a little more discouraged rather than depressed or anxious," but that she had "no suicidal . . . ideation." [*Id*.]. Finally, he indicated that Wentz had "maybe a little bit of mild recent memory impairment and some mild concentration problems." [*Id*.].

On May 5, 2011, Dr. Binkley found that Wentz was "doing quite well at this time on her current medications," was happy with her relationship with Early, purchased a new puppy, was spending time with friends, was sleeping well, had "good" concentration, and was "not voicing any significant complaints." [Tr. 296]. Dr. Binkley appears to have found Wentz's condition unchanged on July 25, 2011. [Tr. 255].

On August 18, 2011, Dr. Binkley recorded that Wentz made progress, and upgraded her

8

GAF score to 60, indicating very moderate symptoms. [Tr. 410]. On November 18, 2011, he found that Wentz was "stable on her current medications," and that her mental faculties, including memory, thought processes, speech, and thought content were normal, and that her operational judgment was fair to good. [Tr. 381]. On February 23, 2012, Dr. Binkley found that Wentz's condition was unchanged from her prior visit. He again found that she was "stable at this time without any adverse side effects from the medications." [Tr. 379]. Wentz reported that she was "doing quite well," was "able to accomplish things she need[ed] to," and did not have "any significant clinical complaints." [*Id.*].

On May 18, 2012, Dr. Binkley found that Wentz was "situationally depressed" because "she has memories about her parents . . . plus she's worried about her grandmother who recently has had some heart problems," resulting in a desire to "sleep more and withdraw." [Tr. 378]. He asserted that "she just has to get through this, which she will." [*Id.*]. He also found that her mental status was normal. [*Id.*]. On August 20, 2012, Dr. Binkley again recorded that Wentz was "psychiatrically stable . . . with no significant complaints." [Tr. 377].

Finally, on September 24, 2012, Dr. Binkley completed a medical source statement using a check-box form, setting forth Wentz's residual functional capacity ("RFC") to perform work-related activities. [Tr. 483-84]. The form defines a "fair" ability to function as the ability to "perform the activity satisfactorily some of the time," with a "poor" level of functioning meaning that the client retains "no useful ability to function." [Tr. 483]. Dr. Binkley rated Wentz's abilities as "poor" in the following areas: ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday or workweek; perform at a consistent pace; and respond appropriately to changes in work setting. [Tr. 483-84]. He found

9

that she had fair to poor functionality accepting instructions and responding appropriately to criticism from supervisors, and adhering to basic standards of neatness and cleanliness.  [Tr. 484].  Dr. Binkley wrote that Wentz suffers from "chronic depressive moods with severe anxiety, poor attention span.  Gets overwhelmed easily."  [Tr. 483].

### 2.   *Other Thumb Alliance Records*

Wentz's other medical records from Thumb Alliance primarily consist of progress notes generated by non-physician staff, including nurses and social workers.  The Court will discuss those parts of the record which clarify the state of Wentz's mental health.

On July 20, 2010, Wentz complained of increased depression over the several months prior, and stated that she recently came close to committing suicide, but was stopped from doing so by the intervention of a friend.  [Tr. 277].  Wentz noted that her depression increased as a result of serving a short sentence in jail due to unpaid child support.  [Tr. 276].  On August 26, 2010, she was found to have the ideation, plan, and means to commit suicide.  [Tr. 289].

On October 5, 2010, Wentz expressed satisfaction with her participation in a peer support program at Thumb Alliance, and said that the group helped her to processes and appropriately manage her frustrations; the social worker recorded that Wentz was "in [the] contemplative stage of change."  [Tr. 339].  On October 6, 2010, Wentz operated an information booth at a volunteer event; she expressed some nervousness about interacting with large groups of people, but was able to complete that task following a discussion with therapists.  [Tr. 338].  On October 21, 2010, Wentz expressed interest in joining a cooking class.  [Tr. 335].

On April 6, 2011, a social worker recorded that Wentz "has been taking care of [Early] and is now being paid" for her work as a caretaker.  [Tr. 329].  On May 3, 2011, Wentz participated in group therapy, and "had to be directed back to topic, but did so without difficulty.

10

She followed the material and remained on task."  [Tr. 320].  On May 25, 2011, Wentz was found to be "all smiles as she and [Early] are to marry."  [Tr. 316].  The therapist stated that Wentz "is [at the] maintenance stage of change."  [*Id*.].

On August 18, 2011, Wentz worked to develop a rehabilitation plan.  [Tr. 254-62].  In that planning session, she reported attending drop-in therapy sessions at Thumb Alliance daily.  [Tr. 256].  Regarding her past history, Wentz stated that she suffered from depression for 10 years, during which time she had suicidal thoughts with a plan, and sometimes cut herself.  [Tr. 258].  At the time of treatment, Wentz had intermittent suicidal thoughts without a plan, but experienced no hallucinations, no longer had a passive death wish, and "use[d] the skills she learned to distract herslf [sic]."  [*Id*.].

Records show that Wentz regularly attended and/or assisted in the weekly bingo program at Thumb Alliance from at least September 2, 2010 into 2012.  [*See*, *e.g.*, Tr. 309, 310, 313, 317, 319, 327-69; 420-25].  However, during several bingo sessions in October and December 2011 Wentz had to be "reminded several times to keep her comments to herself" because she was speaking out of turn and disrupting play.  [Tr. 468, 477-79].

On October 18, 2011, Wentz stated that she was "very excited and had good news" because "she [was] on the medication that works best for her," and consequently "she fe[lt] like she could handle anything.  [Tr. 473].  On February 14, 2012, Wentz reported that she was "maintaining her recovery."  [Tr. 453].  On April 19, 2012, Wentz reported "no current stress in her life and [was] happy with her routines."  [Tr. 438].  On May 16, 2012, her social worker felt that Wentz had reached the "action stage" of her recovery, and was taking appropriate steps to recover from her mental conditions.  [Tr. 435].  On June 13, 2012, Wentz told therapists that she was "doing well" in her relationship with Early, and was successfully "keeping herself busy at

11

home, and not spending as much time" at therapy sessions.  [Tr. 430].

On July 10 and 18, 2012, Wentz discussed applying to college with her social worker, who helped to guide her through the process.  [Tr. 421-24].  She expressed frustration at filling out application forms, but was ultimately able to complete the task with assistance.  [*Id*.].

In an annual report on August 2, 2012, it was recorded that Wentz spends her time "doing a lot of reading" and "volunteer[ing] at the drop-in [therapy sessions] and finds her days are busy and satisfying."  [Tr. 401].  She was "positive and forward thinking," was in a good mood, and had "remarkable" memory as she was "[a]ble to recall events, dates, names and places in great detail."  [Tr. 407-08].  Overall, she reported "I'm doing good."  [Tr. 411].  On August 16, 2012, Wentz indicated that she was continuing to receive compensation for the care she was providing to her boyfriend, and that she was "looking for more work as a care giver, but [was] unable to find more work…"  [Tr. 386].[3]

b.     *Consultative and Non-Examining Sources*

Dr. Ron Marshall, a state agency psychiatric consultant completed a medical source statement regarding Wentz's mental health on October 13, 2011, in which he opined that Wentz's abilities were moderately limited in the following areas: ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; appropriately interact with the public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in work setting.  [Tr. 62-64].  However, he ultimately concluded that Wentz retains the ability to perform

---

[3] Just two weeks earlier, Wentz reported that she was "'fighting' for her disability and [] not looking for work…"  [Tr. 401].

rote tasks, is able to follow and retain simple instructions, may work better with brief interactions with others, and may have difficulty retaining complex instructions. [Tr. 64].

### 3.  Vocational Expert's Testimony

The VE characterized Wentz's past relevant work as a fast-food worker as being unskilled and performed at a light level of exertion. [Tr. 46]. The ALJ asked the VE to imagine a worker of Wentz's age, education, and work experience in a series of hypothetical questions. First, the ALJ hypothesized a worker without exertional limitations, but who is limited to unskilled work with a Specific Vocational Preparation ("SVP")[4] not exceeding two; low-stress work with only occasional decision-making and changes in workplace setting; and only occasional interaction with the public and coworkers. [Tr. 47]. The VE testified that such a worker could not perform Wentz's past relevant work, but could perform the following positions: cleaner, a medium unskilled position with 5,000 jobs in the Southeast Michigan region; packer, a medium unskilled position with 6,000 jobs in the region; and sorter, a light unskilled position with 4,000 jobs in the region. [Tr. 47-48]. The ALJ then asked whether a worker who would be off task more than 20 percent of the day in addition to regularly scheduled breaks, and who would be absent for more than two days a month, could perform any work. [Tr. 48]. The VE testified that such a restriction would prohibit competitive employment. [*Id.*].

Wentz's attorney then asked the VE to hypothesize a worker of Wentz's age, education, work experience, and who has no physical limitations, but who has mental limitations equivalent to those set forth by Dr. Binkley in his mental RFC assessment. [Tr. 48-50]. The ALJ testified

---

[4] The Dictionary of Occupational Titles (DOT) lists a specific vocational preparation (SVP) time for each described occupation. For instance, using the skill level definitions in 20 C.F.R. § 404.1568 and § 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9. *See Soc. Sec. Rul.* 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

13

that such restrictions would prohibit competitive employment.  [Tr. 50].

### D.        The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Wentz not disabled under the Act.  At Step One, the ALJ found that Wentz had not engaged in substantial gainful activity since August 18, 2011, the alleged onset date.  [Tr. 16].  At Step Two, the ALJ found that Wentz had the following severe impairments: bipolar; generalized anxiety disorder; and panic disorder without agoraphobia.  [Tr. 16-17].  At Step Three, the ALJ found that Wentz does not have an impairment or combination of impairments that met or medically equaled a listed impairment. [Tr. 17-18].  Next, the ALJ assessed Wentz's RFC, finding her capable of a full range of work at all exertional levels, but with the following nonexertional limitations: "the claimant is limited to unskilled work with a SVP not exceeding 2.  The claimant is limited to low stress work, defined as involving only occasional decisionmaking and changes in the work place.  The claimant should have no more than occasional interaction with the public and coworkers."  [Tr. 18-22]. At Step Four, the ALJ found that Wentz is unable to perform any past relevant work.  [Tr. 23]. At Step Five, the ALJ concluded, based in part on VE testimony, that Wentz is capable of performing a significant number of jobs that exist in the national economy.  [*Id.*].

### E.        Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

14

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.      Analysis

Wentz argues that the ALJ should have included in his RFC (and VE hypothetical) that she "would be off task greater than 20 percent of an eight hour work day and have excessive absences."  [9 at 11].  In support of this argument, Wentz relies on (1) Dr. Binkley's mental medical source opinion in which he found that Wentz had "no useful ability to function" in (among other categories) completing a normal workday/workweek; and (2) Dr. Marshall's opinion that Wentz was "moderately limited" in her ability to complete a normal workday/workweek.  [Tr. 484, 63].  Wentz's reliance on this evidence is unavailing.

### 1.      *The ALJ Appropriately Rejected Dr. Binkley's Opinion*

Although Wentz does not characterize it as such, her argument as to Dr. Binkley is essentially that the ALJ violated the treating physician rule by not giving appropriate deference to that doctor's opinion that Wentz had "no useful ability" to complete a normal 40-hour workweek.[5]  Under the treating physician rule, an ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, he

---

[5] Dr. Binkley similarly concluded that Wentz had no useful ability to handle detailed instructions, work at a consistent pace, and respond appropriately to changes in the work setting.  [Tr. 484].  Wentz does not directly challenge the ALJ's consideration of these aspects of Dr. Binkley's opinion, but it is worth noting that the ALJ accounted for them by limiting Wentz to "unskilled work with an SVP not exceeding 2…low stress work, defined as involving only occasional decisionmaking and changes in the workplace… no more than occasional interaction with the public and coworkers."  [Tr. 18].  Additionally, as discussed in Section 2 below, these restrictions are consistent with Dr. Marshall's findings.

must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) citing *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). "The ALJ is not required to explain how he considered each of these factors, but must nonetheless give 'good reasons' for rejecting or discounting a treating physician's opinion." *Shrum v. Comm'r of Soc. Sec.*, No. 10-13795, 2011 WL 6014456, at *4 (E.D. Mich. Nov. 30, 2011) citing *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). Such good reasons must be supported by substantial evidence in the record, and "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 545 (6th Cir. 2004) (quoting SSR 96–2p). An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F.R. § 404.1527(e)(1), (e)(3). Here, the Court finds that the ALJ gave good reasons for rejecting Dr. Binkley's opinion.

First, the ALJ found that Dr. Binkley's opinion was inconsistent with his own treatment notes. This finding by the ALJ is supported by substantial evidence in the record. Specifically, the ALJ referenced Dr. Binkley's treatment notes from November 2011 to August 2012 which indicated that Wentz was "doing 'extremely well' on her medications,'" "doing quite well on her medications," "sleeping well and functioning well during the daytime, her appetite was normal, and she [was] able to accomplish the things she needs to," was "clinically stable" in terms of her bipolar disorder, was "psychiatrically stable," "alert and oriented x3," her grooming and hygiene

were normal, her mood and attitude were normal, and her judgment, insight, thought content, memories, and thought processes were normal. [Tr. 21]. By December 27, 2010, Dr. Binkley found that Wentz was happy with her medication, that her depression was improving, and that her prognosis was good. [Tr. 298]. On February 28, 2011, Dr. Binkley found only "mild" memory and concentration problems, with no ideation of suicide. [Tr. 297]. On May 5, 2011, Wentz expressed that she had "no complaints" and was "doing well." [Tr. 296]. By August 18, 2011, Dr. Binkley found that Wentz had improved to the point where her GAF score merited an increase from 50 to 60, indicating very moderate symptoms[6]; Wentz reported no complaints, was doing well, and was able to accomplish tasks without issue. [Tr. 410]. While the medical records certainly do not reflect a straight-line recovery by Wentz, the records closest in time to Dr. Binkley's opinion show similar improvement overall. In May 2012, just a few months before Dr. Binkley issued the opinion in question, he found that Wentz's mental status was normal and that she would overcome what he described as "situational" depression. [Tr. 378]. And, just a few weeks before Dr. Binkley's opinion, he found that Wentz was "psychiatrically stable . . . with no significant complaints." [Tr. 377; *see also* Tr. 379-381]. In sum, the ALJ appropriately found that Dr. Binkley's opinion that Wentz had "no useful ability" to complete a normal 40-hour workweek was inconsistent with his own treatment notes.

The ALJ also appropriately found that the extreme mental limitations determined by Dr. Binkley were at odds with the fact that Wentz was able to assist with bingo at the drop-in center, and work as a paid caregiver for her boyfriend. [Tr. 21]. In fact, Wentz testified that, in addition to all of her other activities, she spent 2-4 hours daily providing care for her boyfriend. [Tr. 35].

---

[6] *See Gray v. Comm'r of Soc. Sec.*, No. CIV.A. 11-12075, 2012 WL 2374225, at *6 (E.D. Mich. May 21, 2012) (holding that a GAF score of 60 was inconsistent with a finding of marked limitations in several areas of mental functioning)

The ALJ appropriately concluded that these activities suggest greater mental capabilities than the extremely limited ones set forth in Dr. Binkley's mental RFC assessment.  [*Id*.].[7]

In sum, the ALJ's finding that Dr. Binkley's extremely restrictive mental RFC assessment was inconsistent with the overall medical records is supported by substantial evidence.  His decision to "assign greater weight to the treatment notes than [Dr. Binkley's] opinion" was therefore proper.  Moreover, the ALJ appropriately considered Wentz' limitations and provided restrictions in his RFC to account for them, including a limitation to low stress work, only occasional interactions with others, and unskilled work with a SVP not exceeding two.  [Tr. 18-22].

### 2.      *The ALJ Did not Err in his Consideration of Dr. Marshall's Opinion*

Wentz also argues that the ALJ erred in his consideration of consultative psychiatrist Dr. Marshall's opinion that Wentz was moderately limited in her ability to complete a normal work week without interruption from psychologically based symptoms, and her ability to perform at a consistent pace.  Wentz argues that Dr. Marshall's opinion "strongly suggests [she] would be unable to sustain attendance to be gainfully employed."  [9 at 11].  But this argument is flawed for multiple reasons.  First, Wentz's argument impermissibly equates a "moderate" limitation in completing a workweek with a determination that she is completely disabled; Wentz provides no legal authority for such a leap, and the Court is not aware of any.  Second, Wentz's argument ignores Dr. Marshall's more specific ultimate conclusion that she retains the "ability to do rote

---

[7] Wentz's treatment notes from other staff members at Thumb Alliance also undermine Dr. Binkley's restrictive mental RFC assessment.  Although Wentz's condition appeared very serious during her early visits with Thumb Alliance in 2010 [Tr. 277], she expressed satisfaction with her peer support therapy.  [Tr. 339; Tr. 473 (indicating that Wentz was very happy because she was on "the medication that works best for her," and "felt like she could handle anything"); Tr. 453 (Wentz had had no stress, was maintaining her recovery, and was happy with her routines); Tr. 421-24 (Wentz expressed her desire to return to college, and completed application paperwork)].

tasks," and is "able to follow & retain simple instructions." [Tr. 64]. Third, the medical records subsequent to Dr. Marshall's October 13, 2011 opinion are consistent with the ALJ's interpretation of that opinion, and inconsistent with Wentz's interpretation. *See* discussion *supra* at 17-18. Particularly in light of that evidence, it was entirely appropriate for the ALJ to credit Dr. Marshall's ultimate conclusion about Wentz's ability to work, and include appropriate limitations in Wentz's RFC to address her impairments. *See Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *8 (E.D. Mich. June 16, 2008) (holding that "selective adoption of [a physician's] 'moderate' limitations without considering [the] ultimate conclusion would amount to a distortion of the record" and that any limitations "must be analyzed alongside [the] conclusion that Plaintiff was capable of a limited range of work").

Indeed, the ALJ adopted an RFC which is consistent with Dr. Marshall's findings by limiting her to unskilled, low-stress work with a SVP not exceeding two, with limited decisionmaking or changes in the workplace, and limited interaction with the public and co-workers. *See Brasseur v. Comm'r of Soc. Sec.*, No. 08-12487, 2009 WL 1121625, at *6 (E.D. Mich. Apr. 23, 2009) (noting that "[u]nskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment"); 20 C.F.R. § 404.1568(a); *see also Sample v. Comm'r of Soc. Sec.*, No. CIV. 12-12018, 2013 WL 2318808, at *16 (E.D. Mich. May 28, 2013) (finding that a restriction to unskilled work may sufficiently account for moderate limitations to concentration, persistence, and pace where "there is no evidence of disabling mental impairments"). In sum, this aspect of the ALJ's decision is supported by substantial evidence.

### III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Wentz's Motion for

20

Summary Judgment **[9]** be **DENIED**, the Commissioner's Motion **[11]** be **GRANTED** and this case be **AFFIRMED**.

Dated: July 10, 2015                          s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                             United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 10, 2015.

                                             s/Eddrey O. Butts
                                             EDDREY O. BUTTS
                                             Case Manager